**Robert R. Calo**, OSB No. 071037
calor@lanepowell.com
**LANE POWELL PC**
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone:  503.778.2100
Facsimile:  503.778.2200

Attorneys for Defendant Child Foundation

**Erin M. Wilson**, WSBA No. 42454 (*Pro Hac Vice*)
wilsonem@lanepowell.com
**LANE POWELL PC**
1420 Fifth Ave., Suite 4100
Seattle, Washington 98101
Telephone:  206.223.7000
Facsimile:  206.223.7107

Attorneys for Defendant Child Foundation


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON


| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:05-cr-00413-KI |
| Plaintiff, | **DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM** |
| v. | |
| MEHRDAD YASREBI AND CHILD FOUNDATION, | |
| Defendant. | |


## I.  INTRODUCTION

Standing before this Court is a charity, Child Foundation (or "the Foundation"), that has—from its inception and for over seventeen years—faithfully and steadfastly served the needs of over 12,000 poor children around the world.  It is a charity that readily accepts responsibility for the action of its former President for conduct that occurred four to five years ago.  The

PAGE 1 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

Foundation fully understands its criminal liability under the doctrine of *respondeat superior,* in which an organization may be held criminally liable for the illegal acts of its directors, officers, employees, and agents.

However, the question before this Court is not guilt or innocence—the question is: what is the fair and proportionate punishment that should be meted out to this organization as it now exists in 2012?  The government will urge the Court to impose a substantial fine and a lengthy period of probation.  Such a sentence is not only unwarranted under the facts here, but would in fact violate the central tenants of sentencing: to (a) provide "just punishment for the offense" and (b)  "impose a sentence ***sufficient, but not greater than necessary***, to comply with [the purposes of sentencing]" (emphasis added). 18 U.S.C. § 3553(a); *Pepper v. United States,* 131 S.Ct. 1229, 1242 (2011) ("sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)").

Contrary to the government's assertion, the facts and legal arguments set forth below militate toward the Court imposing a "just" and "sufficient" sentence that would include a fine of no more than $10,000 (a substantial penalty and financial burden for a non-profit organization that devotes almost all of its funds to aiding the poor) and no period of probation.

Several factors present in this case support such a sentence.  First, the Foundation has fully complied with the extraordinary and atypical terms of the Plea Agreement.  Specifically, it has (1) notified its donors and contributors for the past five years in writing of its criminal behavior,[1] (2) implemented an effective compliance program, and (3) terminated employment of its current office manager.[2]

---

[1] A copy of the notice is attached as Exhibit A to the Declaration of Navid Seyedali ("Seyedali Decl.").

[2] Indeed, the facts that have unfolded with regard to the office manager demonstrate the degree to which the Foundation is cooperating and demonstrating its role as a good "corporate citizen." At the time the plea agreement was negotiated, the government indicated that the office manager must be fired based upon concerns raised by prosecutors in the Southern District of New York

PAGE 2 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

Second, under 18 U.S.C. § 3553(a)(1), the "history and characteristics" of the Foundation support the sentence requested by the defense. The history is quite exemplary and laudable. As will be shown below, the Foundation has a long standing history of substantial humanitarian aid to poor children in Iran and throughout the world. Child Foundation's programs currently serve children in Afghanistan, Indonesia, Iran, and the United States, and the majority of their sponsors live in the United States. The Foundation has also given to earthquake relief charities in Pakistan, Haiti and Japan. The charity does not have any government, political or religious affiliation, and its sole focus is to provide aid to those in need. Seyedali Decl. at ¶ 3. Moreover, that aid has not only benefitted the children (resulting in many "success stories"-some of which will be enumerated in this memorandum), but has had a broader effect of enhancing the standing and reputation of the United States with the people of many of these countries (a powerful counterweight to the negative anti-U.S. propaganda the governments of those countries frequently generate).

In addition, the "characteristics" of the Foundation as it now stands before this Court support the more proportionate and fair sentence suggested by the defense. As will be shown below, the Foundation—on its own initiative—has gone above and beyond the requirements of the Plea Agreement and has completely revamped its operations, compliance, and personnel; it has replaced many of its employees in its Portland office and affiliated organization in Iran; it has a new and active Board of Directors who have stepped up to ensure the proper operation of the Foundation, and it also has implemented a sophisticated system of checks and balances to assure the lawful and efficient operation of the Foundation as it moves into 2012 and beyond.

Accordingly, the dictates of Section 3553(a) warrant the sentence suggested by the defense. An alternative course would not be just and fair. Specifically, any greater fine than the

---

(SDNY). Subsequently, however, officials in SDNY concluded they no longer had any concerns with the office manager. The prosecutors in the case at bar, however, still insisted that the office manager be fired, based upon their claim of "other" security concerns (but would not give any indication of what those concerns were). Notwithstanding this, the Foundation went ahead and terminated the office manager.

PAGE 3 -    DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

$10,000 proposed by the defense would be punitive; such a fine would not meet any policy factors set forth in 3553(a), and any such fine would literally take away resources needed to help poor children.

Similarly, any period of probation would be a punitive and unnecessary penalty. The new leaders of the Foundation have "self-imposed" many changes and safeguards to the organization and such changes demonstrate that the Foundation can govern itself through policies/processes that would ensure it would not face similar legal problems. For this reason, additional supervision by the Probation Office would just be an unnecessary use of scarce government resources. In addition, Probation is unnecessary given the continuing duties of cooperation imposed upon the Foundation under the Plea Agreement. Specifically, the Foundation has a continuing duty of cooperation with the Executive branch to provide its employees for interviews in any "future criminal or civil proceedings" and to volunteer any records, documents or evidence "in connection with such cases." Plea Agreement ¶ 6. Moreover, any period of probation would severely hamper fundraising efforts by the Foundation, impact morale of the employees, result in additional costs which would undercut resources for the poor, and would create havoc in the Foundation's attempts to maintain critical banking relations here in Portland to keep the flow of aid going to the poor. Those are severe collateral consequences that this "new" and revamped organization should not have to bear going forward. The stigma of the felony has been a substantial punishment to the Foundation and has already caused substantial financial and reputational harm to the Foundation; a realistic fine and the continuing obligations of cooperation with the government are all the additional punishment necessary to assure that the sentence is "sufficient, but not greater than necessary," to comply with the mandate of 18 U.S.C. § 3553(a).[3]

---

[3] Child Foundation joins in and adopts all arguments made by Mehrdad Yasrebi in his sentencing memorandum to the extent that they bear on Child Foundation, including, but not limited to the following arguments: (1) the evidence of wrongdoing uncovered by the government's lengthy investigation is relatively insignificant in light of the extent and intrusiveness of the investigation; (2) the underlying cash transfers to Iran were legal; (3) Child Foundation and

PAGE 4 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

## II.  CHILD FOUNDATION IS A LONG STANDING CHARITY HELPING CHILDREN ALL OVER THE WORLD.

### A.  History of Child Foundation

Child Foundation's mission is, and has always been, to help children in need.[4]   The Foundation was formed for this very purpose in 1994 by Mehrdad Yasrebi, and since then, it has provided basic necessities to children living in poverty by enhancing the quality of life for these children and their respective families.  There is no evidence that Child Foundation has acted at any time to further any goals other than its charitable mission.   By providing basic life necessities and access to education, Child Foundation hopes to increase the number of students graduating from school, especially girls, and to improve their lives in the most fundamental way. Child Foundation was the first organization established in the United States to develop a large scale sponsorship program to assist children living in poverty in Iran.  Child Foundation works in connection with Refah Kudak, an NGO in Iran, to distribute food, clothing, medical supplies, and educational materials to needy children in Iran, regardless of their religious preferences. Child Foundation's programs currently serve children in Afghanistan, Indonesia, Iran, and the United States, and the majority of their sponsors live in the United States.

### B.  Child Foundation's Humanitarian Aid

#### 1.  Sponsorship

As discussed above, Child Foundation's mission is to help children in need, and it has been doing precisely that all over the world for a number of years.  One of the most significant forms of aid Child Foundation provides is through "sponsorship."  Sponsorship provides ongoing stability for a child in need, with the hopes of enabling that child to remain in school.  By pairing a child with a sponsor, the child receives the necessary aid that he or she needs.  Generally,

---

Yasrebi were transparent with OFAC and in no way attempted to conceal their activities; and (4) U.S.S.G. § 1B1.1(a) is the appropriate offense guideline.

[4] Child Foundation only has seven employed staff members, all of whom share one small office in Portland, Oregon, in order to keep operational costs low.

PAGE 5 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

children sponsored through Child Foundation's programs are supported for their entire academic career. For some children, this is up until high school, for others it may mean throughout their college years. Sponsors pay a minimum of $20 per month to sponsor a child, and the amount necessary to sponsor a child depends on the age of the child. Some children have more than one sponsor.

The children in the sponsorship programs are first and foremost in need, and Child Foundation uses social workers and teachers to identify children who are gifted and talented and have the desire to succeed. The sponsors' donations provide relief to the children in the form of food, clothing, medical assistance, and educational materials. The sponsors receive updates every six months from Child Foundation. This report updates the sponsors on the child's academic progress, his or her living conditions, and any changes in the child's mental or physical health. Furthermore, hundreds of Child Foundation's sponsors have gone to Iran to visit their sponsored children. In turn, the sponsors obtain a first-hand understanding of the positive impact of their assistance. And, in countries other than Iran, CF assists with shelter and provides emergency funding for children and their respective families. Child Foundation has been sponsoring children for the past seventeen years in Iran, Afghanistan and Indonesia. Its programs are increasingly helping young girls, and 62% of sponsored children are now girls.

Child Foundation's incredible work has made a tremendous impact both on its beneficiaries and on its donors. Letters of support directed to the Court are attached to the Declaration of Erin M. Wilson ("Wilson Decl."), and they read, in part, as follows:

Letter from H. Elahinia (Ex. A):

> In a letter sent to me by Fatemeh, the child I am supporting, she said what would translate to "I hope that someday I will be able to repay to you all the help and support you have provided [over the years.]"[5]

Letter from M. Elahinia (Ex. B):

---

[5] This particular letter raises a related issue that Child Foundation is very proud of. Because Child Foundation is so dedicated to its work in Iran and making that country a better place, Child Foundation's work is actually improving many Iranians' perception of the United States.

PAGE 6 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

When we started our monthly donations our sponsored child Fatemeh was in a difficult economic spot and about to drop out of middle school. Now she is about to finish her first year of college. In a trip to Iran 3 years ago we visited Fatemeh and her family and had a first hand observation of the positive effect of the foundation in making a significant difference in the life of her and several other orphans in the same neighborhood.

Letter from A. Mahallati (Ex. D):

In March of 2004, I went to Iran and met with two of my sponsored children at the Child Foundation headquarters office in Tehran. I was impressed with their operations. As a proud achievement, I would like to inform you that as a result of our continuous support, one of our sponsored children has graduated with high honors form [sic] Isfahan University few years ago.

Letter from S. Farhani (Ex. F):

I think of the letters I receive from my sponsored child in Iran and her living situation and I simply cannot imagine her losing ANY financial support from me or any other donors.

Letter from A. Behnejad (Ex. G):

I have visited the village in northwest Iran, where the child I have been donating for lives, and the experience has only strengthened my trust and devotion to the Child Foundation. After speaking with several residents of the town, I learned that the money that is donated, minus their minor administrative costs, is in fact given to the boy I was shown at the start of my donation process, the same boy I recently personally met.

Letter from S. Khamcy (Ex. H):

I am currently sponsoring four children. The oldest one is now in college & youngest one, a survivor of Bam's earthquake who lost both her parents is in 5th grade. I get regular reports of their status in school & visit them when I travel to Iran. I wish … you could also see the difference that my support had made.

Letter from M. Houtan, Ph.D. , who sponsors five minors, aged 7-12 (Ex. I):

During one of my travels to Iran, I had the opportunity to meet one of these children …The boy I met was twelve-years-old and had lost his father in an auto accident. His mother cleaned houses to provide for him and his younger brother and sister. I also learned that in order to help his mother he worked in the corner grocery store after school, on holidays, and during summer vacation. A few years later, I was delighted to receive a report that the boy I met had finished high school and was preparing to go to college.

Letter from H. Sobhani (Ex. J):

I have received hundreds of letters, pictures, and school year end reports for those children who I support…[B]ased on the reports of children's positive progress in school and achieving their goals, how they receive their aids regularly through

PAGE 7 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

CHILD FOUNDATION, how this little money means a lot to them, and how appreciative and thankful they are…I literally cry When I read these unfortunate children's letters and I truly want to help more children if I can afford to do so.

Letter from M. Mazloom (Ex. K):

I was blessed to become the sponsor of a young lady that just had started college to study Law … I am proud to tell you that she finished her graduate degree and passed her Bar exam and is practicing Law in Shiraz, Iran…In the past 6 years, I personally have visited the main office in Tehran and Shiraz and have met with the staff and a few children that are under foundation umbrella and can assure you that all of the help from private supporters like me is directed put in use to help the children and their education…Presently I have 7 children that I partially help thru the foundation and have met several of them.

Letter from J. Sahandy, M.D., who has sponsored CF children for the past 10 years (Ex. N):

One of the children I supported financially, was a 9 years old girl from a family of 4 children by the name of Fatemeh [].[6]  She was from poor famlily [sic] who lived in a one room shack without plumbing or shower.  Her father was disabled due to 3rd degree burn at his old job and mother picked up a janitorial job to be able to support 6 members of the family.  If it was not for my financial support and other sponsors who donate money to Child-Foundation, she was not able to finish High School or have enough food or clothing.

Letter from A. Sarmast (Ex. P):

I was able to meet my sponsored child, Maedeh, when I travelled to Iran.  I could see how staff member of Child Foundation care about them and the money I had been paying for years was properly used for her to continue her education.  Maedeh recently passed the university entrance test and enrolled in her classes.

Letter from A. Radmehr, Ph.D. (Ex. T):

I have been supporting two beautiful children, one girl named Arezo and one boy named Ali, through Child Foundation for the past 8 years.  My wife also supports two children.  Arezo lost her father when she was an infant and over the years her mother developed schizophrenia.  She lives with her mother and grandmother in dire conditions.  Despite all the misfortunes in her life, Arezo has been determined to change her fortune through hard work and patience.  Ali and the other two children my wife supports have similar stories.  I visited Arezo and Ali along with their families several times during my travels to Iran.  I saw their poverty, their terrible living conditions, and their ill parents and caregivers.  But I also saw the hope that Child Foundation gave them...Even though it is very difficult to enter a good university in Iran, last year Arezo was accepted in one of the top universities and has started her major in English Literature.

Letter from N. Bibak, Ph.D. (Ex. X):

---

[6] The last names of children identified in these letters have been redacted to protect the children's identity and confidentiality.

PAGE 8 -   DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

To find out more about Child Foundation and find out if Fatemeh is receiving the money I was sending monthly through this organization, I visited the Child Foundation facility in Iran in September 2010 when I was on vacation in Iran. They arranged so I could visit Fatemeh at their facility. I was so touched after hearing how much she really needed my support to just have enough food to eat and be able to go to school.

Letter from Babak Bafandeh, Ali Bafandeh, and Shahla Sedighi (Ex. BB):

Over the past seven years, our family has supported the education of four girls from middle school to college through child foundation and we were fortunate to meet with these girls during our periodic visits to Iran. Every conversation and every letter we receive from these girls reminds us of how fortunate we are and have been and how much we don't know about another less privileged world that is out there. When we learn that girls work overnight to support their old mother but yet attend and outperform in the classroom in the morning in hope of a better world, we no longer have a choice to support them in their mission but rather a moral obligation to do so.

Letter from Massoud Nekoobahr (Ex. CC):

I have been sponsoring Ms. [] since 2000 when she was in primary school in Iran. Her father had already passed away of a liver disease at that time, and she along with her two siblings and her mother were living in a very poor condition. [] is a college student now and is going to be an accountant.

## 2. Disaster Relief

Child Foundation's charitable work reaches a number of countries worldwide. Seyedali Decl. at ¶ 3. For example, in recent years, Child Foundation conducted successful fundraisers for Haiti earthquake victims, as well as for children who were victims of the Pakistan floods. This year, Child Foundation organized a fund to assist children and their families affected by the major tsunami and earthquake in Japan. Child Foundation has also worked to provide relief to victims living in the earthquake stricken areas of Turkey. For example, in 2003, Child Foundation sponsored distribution of 240 wheelchairs to school age children in Istanbul, Turkey.

## 3. Humanitarian Aid in Afghanistan

Child Foundation is also active in Afghanistan, where children are in great need of their help. Child Foundation operates a school in a poor region of Afghanistan that is run by dedicated volunteers and social workers. The Foundation also helps children in Afghanistan who

PAGE 9 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

have Thalassemia, a blood disease prevalent in that country.  Recently, Child Foundation's office in Afghanistan received a grant of $25,000 from the UN Habitat Youth Fund, funded by the United Nations, to establish an educational program in Afghanistan.

### 4.  Local Humanitarian Aid and Collaboration with Other Charities

Furthermore, in countries other than Iran, Child Foundation collaborates with numerous universities to make funds available to students who are economically disadvantaged.  Child Foundation also collaborates with Habitat for Humanity, the American Cancer Society, and the Boys and Girls Clubs of America, among other charities.  In addition, the Foundation offers programs for children with special needs, including abused children, blind children, children with cancer, and deaf children.  Seyedali Decl. at ¶ 3.

Child Foundation has also provided financial aid to local children.  *Id.*  For example, it donated a scholarship to Minds Matter in Portland to help high achieving children from low income families in the greater Portland area.  It also accepts donations during Thanksgiving so that the Foundation can create food packages for the Thanksgiving holiday.  Its outstanding commitment to its humanitarian mission has not gone unnoticed.  In 2008, the Foundation was awarded the Independent Charities Seal of Excellence by Independent Charities of America.  This seal is given to organizations that demonstrate and meet the highest standards of public accountability, program effectiveness, and cost effectiveness.  Any fine issued in this case will only harm the Foundation's ability to provide relief to those in need.

### 5.  Success Stories

Below is a small sample of success stories that Child Foundation is proud to share with the Court.  If not for Child Foundation, these children would be in far less hopeful positions.[7]

#### a.  *Sohelia.*

Sohelia lost her father when she was only five years old.  Her mother was unable to support her and so she was placed into an orphanage.  Six years later she was dismissed from the

---

[7] *See* http://www.childfoundation.org/AboutUs/SuccessStories/tabid/71/Default.aspx.

PAGE 10 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

orphanage because her brother was old enough to take care of her. He, however, was addicted to heroin. So, Sohelia spent her nights alone on the street while she waited for her brother and his friends to fall asleep. Once they were asleep, she knew it was safe for her to return home. Child Foundation social workers learned of her situation and placed her in the care of her older sister. Sohelia's sponsors helped her to graduate from college with a chemistry degree. She is now married to one of her University classmates.

   b.   *Kobra.*

Kobra was a sixteen year old girl living with her mother and five brothers and sisters. When a Child Foundation social worker first met with her, she was obviously depressed and withdrawn. After being under Child Foundation's care, her academic and personal life flourished. In 2000, she was admitted to University.

   c.   *Mahsa.*

Mahsa's parents died in a gas link accident. She then went to live with her grandparents, who were already having a hard time meeting ends meet. A doctor from Maryland decided to sponsor Mahsa, who now has a "family" in the United States.

   d.   *Mostafa.*

Mostafa is legally blind and from a broken home. Neither his mother, nor his father, nor his grandmother looked after him. He was placed in a center for blind children. With assistance from his Child Foundation sponsor, he graduated and has been admitted to Ferdowsi University of Mashhad, majoring in law.

   e.   *Samira.*

A group of Iranian students studying in Sweden sponsor Samira. Her father left her family and she lost her mother in a tragic accident. She lives with her aging grandparents and attends middle school. With the help of her young sponsors, she has been able to maintain a great GPA and is excelling in school.

**C.  Changes Child Foundation has Made Since the Plea Agreement**

PAGE 11 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

Since entering into a plea agreement with the United States government in January of 2011, Child Foundation has made significant efforts to improve its business operations such that it can remain in full compliance with all State and Federal rules and regulations pertaining to non-profit organizations while attending to its humanitarian activities. Seyedali Decl. at ¶ 4. However, even before Child Foundation entered into the plea agreement, and with Yasrebi's encouragement, Child Foundation made significant strides to improve and strengthen the organization. *Id.* In 2008, Child Foundation adopted a business management system in order to systemize Child Foundation's business operations. *Id.* Child Foundation also adopted short and long term plans for the organization at that time. *Id.* These plans were extensive and included activating Child Foundation committees defined in Child Foundation's bylaws, recruiting new board members, and implementing a systemized approach to Child Foundation's business. *Id.* Accordingly, since 2008, the Child Foundation Board of Directors ("Board") has been striving to improve the business management structure of its operations.[8] *Id.*

    1.  <u>Improvements to the Board of Directors and Accounting Department</u>.

In recent years, Child Foundation recruited and added three new members to the Board: Dr. Peyman Raoofi, Dr. Ali Eydgahi, and Mr. Mohammad Zarrabi-Kashani. The business, leadership, and volunteer experience of the Board are a tremendous benefit to CF. A brief summary of Child Foundation's Board is summarized below.

Navid Seyedali is currently serving as Child Foundation's President. He has a civil engineering degree and a master's degree in transportation engineering, and he provides consulting services to aerospace and airline industries. He has been involved with Child Foundation for over fifteen years, starting as the Regional Manager in Bandung, Indonesia in 1994. He is responsible for the development of Child Foundation's sponsorship program in Indonesia.[9] Dr. Akbar Farahani is Child Foundation's Vice President. He has a PhD in civil

---

[8] Yasrebi, while he was still working with the Foundation, encouraged and supported the Board in its efforts to improve its operations, compliance, and management.

[9] Yasrebi started Child Foundation's sponsorship program in Iran.

PAGE 12 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

engineering and structural mechanics.  He is currently the Vice President and Director of Engineering at ETA Inc. in Michigan.  Dr. Asad Azemi is currently serving as Child Foundation's Secretary.  He is a co-founder and long term member of Child Foundation's Board. He has a PhD in electrical engineering and is currently an Associate Professor at Pennsylvania State University.  Dr. Peyman Raoofi is currently serving as Child Foundation's treasurer.  He has a doctoral degree in clinical psychology.  He is a member of the Board of Directors of the Los Angeles County Psychological Association and the Board of Iranian Psychological Association of America.  He is the recipient of the highest level of honor of the President's Volunteer Service Award.  He has also been recognized as an Honorary Ambassador by UNICEF.  Mr. Mohammad Zarrabi-Kashani, a new member of the Board, has an industrial technology and manufacturing degree as well as an MBA.  He works in the commercial aerospace industry, and he joined Child Foundation's board in August of 2011.  Dr. Ali Eydgahi, another new Board member, has a master's degree and a PhD in electrical and computer engineering.  He has been an administrator or faculty member of State University of New York, Tehran University, and Eastern Michigan University.  He joined Child Foundation's board of directors in August of 2011.

In addition to increasing the Board's functionality by recruiting new members, as part of its 2008 strategic plan, Child Foundation began replacing its accounting staff in 2010.  Seyedali Decl. at ¶ 5.  Child Foundation has replaced all members of the accounting department that were in place during the government's investigation.  *Id.*  An experienced accountant is now heading Child Foundation's accounting department, and Child Foundation's tax accounting is outsourced to an independent accountant.  *Id.*  Accordingly, the Foundation's accounting is accurate and in line with industry accepted practices with monthly account reconciliations and a day-to-day financial management system. *Id.*  An outside accounting auditor provides a monthly review of Child Foundation's accounting. *Id.*  Accordingly, Child Foundation has completely overhauled

PAGE 13 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

its financial operations and accounting department. *Id.* Weekly reports on financial information are now provided to the Board. *Id.*

The Board is also meeting more frequently so as to increase its oversight of Child Foundation's functions. *Id.* at ¶ 6. In addition to the monthly Board meetings that Child Foundation has traditionally had, the Executive Committee now holds bi-weekly meetings, which results in a significant increase in Board oversight of Child Foundation's executive matters. Child Foundation is also working to more accurately assess its management and its staff's work. *Id.*

2.    Increased Use of Legal Advisors.

Importantly, Child Foundation has expanded its legal committee and use of outside counsel. Mr. Wayne Rucsh and Dan Fisher-Owens of Berliner, Corcoran & Rowe, LLP (the "Berliner Law Firm") advise the Foundation on Treasury Department and OFAC issues.[10] *Id.* at ¶ 8. Mr. Filmore Rose of Lane Powell has been providing advice on 501(c)(3) organizational and compliance matters, and Ms. Tina Foster of the International Justice Project has been working with the Foundation to implement an effective internal compliance and governance system. *Id.* In light of Child Foundation's expanded legal team, the Foundation is confident that its future operations will closely follow government rules and regulations. *Id.*

3.    Improved Compliance Program.

Because Child Foundation is deeply committed to strictly following all government rules and regulations, Child Foundation has implemented a new compliance program with the supervision of Child Foundation's compliance counsel. Seyedali Decl. at ¶ 8. Child Foundation worked tirelessly to draft a compliance program that will ensure Child Foundation operates

---

[10]  Berliner, Corcoran & Rowe, L.L.P. is a prestigious boutique law firm that has substantial expertise in assisting clients on all aspects of international business. The Berliner Law Firm represents and counsels numerous clients on export controls, embargoes and sanctions, anti-boycott laws, foreign military sales, and customs. Information on the Berliner Law Firm can be found on their website: *http://bcr.us/*

PAGE 14 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

within the bounds of all applicable United States laws and regulations.[11]    *See* Ex. B to the Seyedali Decl.

The compliance program requires all Foundation staff and Board members to comply with all Foundation policies and provides for a reporting structure and disciplinary action for any violations thereof.    *Id.* The program requires the Foundation to operate to further the organization's charitable objectives. *Id.* Specifically, the Board is required to ensure that organizational funds are spent in accordance with both the Foundation's mission and donor-intent and to arrange annual financial audits by an independent third-party. *Id.* The compliance program further prohibits donors from exercising control over their donations after the funds are transferred to the organization. *Id.*

Moreover, the compliance program specifically provides that the Foundation "must comply with OFAC's "requirements in carrying out activities both domestically and abroad." Furthermore, the program provides that the Board "has structured its Iran sponsorship program to avoid running afoul of trade restrictions and sanctions against Iran…CF staff and Board are prohibited from providing or receiving funds, goods or services of any kind from any office or agent of the Iranian government." *Id.* In order to stay within the bounds of United States law, "CF transfers food items (only) to an Iranian non-governmental organization. The Iranian NGO in turn distributes the food to CF's sponsored children in Iran." In addition, the program provides as follows:

> Should CF wish to broaden its charitable activities within Iran beyond the distribution of humanitarian articles, CF must consult with legal counsel in order to ascertain whether a specific license from OFAC will be required. Thus, CF staff and Board members are prohibited from enlarging CF's activities in Iran beyond the delivery of food items described in its Memorandum of Understanding

---

[11] Child Foundation has also implemented new compliance provisions with respect to 501(c)(3) regulations. They did so in order to ensure that no donor has any control or influence over donations after they are made.

PAGE 15 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

with RK (see section 5.4.2 above) without prior approval from CF's outside legal counsel.

*Id.* Moreover, any "financial transaction facilitating CF's provision of humanitarian articles to sponsored children within Iran must not involve a prohibited Iranian financial institution." *Id.*

In addition, Child Foundation now has two Compliance Officers. Seyedali Decl. at ¶ 8. One Compliance Officer is a board member who has oversight on governance issues, and the other is a member of Child Foundation's office staff who has oversight on office issues. *Id.* Their responsibility is to ensure that Child Foundation follows the established policies and procedures. Furthermore, it is important to note that Child Foundation, as part of its 2008 strategic plan, has been able to shift its operations from being primarily run by an individual (the past president) to being run by a Board acting under a detailed compliance program.

    4.  <u>Background Checks.</u>

Child Foundation has invested in software dedicated to conducting background checks of all entities and individuals working with Child Foundation all over the world. Seyedali Decl. at ¶ 9. Each new donor is vetted to ensure that he or she is not on the government's Specially Designated Nationals list. *Id.* The Foundation also cross-checks its list with other foreign governments' terrorism watch lists. *Id.* In addition, Child Foundation checks each child and his or her parents to make sure that they are not listed on the Specially Designated Nationals list. *Id.* Child Foundation has implemented this software even though it has never provided any money to any organization or individual associated with any terrorist activity. *Id.* The background check is an ongoing process since CF attracts donors, volunteers, sponsors and sponsored children every day. *Id.*

    5.  <u>Current Methods of Donation.</u>

Presently, Child Foundation's Iran program is operating under a government exemption regarding the economic sanction regulations against Iran that allows CF to import food items to Iran for the purpose of alleviating human suffering. Pursuant to 31 C.F.R. 560.204, United States persons are prohibited from engaging in the export, sale, or supply of goods, technology,

PAGE 16 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

or services to Iran.  They are further prohibited under 31 C.F.R. 560.206 from engaging in transactions or dealings related to goods, technology, or services intended for export, sale, or supply to Iran.  However, there are exemptions in the regulations and Child Foundation has prudently engaged the Berliner Law Firm to determine if Child Foundation fits an exemption. The Berliner Law Firm has indicated that an exemption applies to Child Foundation.  *See* Wilson Decl. at ¶ 33.  Specifically, the Berliner Law Firm has advised that the provisions of 31 C.F.R. 560.210(b) exempt transactions from the prohibitions of 31 C.F.R. 560.204 and 560.206 if they consist of "donations by United States persons of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering."  *Id.*

Accordingly, the Berliner Law Firm has advised that Child Foundation's provision of food, clothing, or medicine to Refah Kudak for distribution to needy children falls within the 31 C.F.R. 560.210(b) exception because (1) the donations consist only of food, clothing or medicine; (2) the ultimate recipients have been identified as children suffering from poor economic conditions, such as hunger, lack of proper clothing, and lack of proper medical care; and (3) the items will not be sold to any person in Iran.  *Id.*  Consequently, Child Foundation donations qualify as donations of items specified in 31 C.F.R. 560.210(b), and are intended by Child Foundation to be used to relieve human suffering. The Berliner Law Firm has therefore advised that the intended purchases of bulk commodities outside Iran, their provision to Refah Kudak, and the distribution of those commodities to children under Child Foundation sponsorship is not prohibited.  *Id.*

The Berliner Law Firm has also advised that Child Foundation need not apply for a general license under 31 C.F.R. 560.530, as there is no need to get a license for the export from the United States of any items that meet the definition of "food,"  because  Child Foundation's donations are exempt from the regulations as humanitarian donations. *Id.*

Child Foundation has also modified the methods by which donations of food are sent overseas.  Seyedali Decl. at ¶ 10.  Prior to the plea agreement, Child Foundation used a local

PAGE 17 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

office in Dubai to purchase the needed food commodities and send them to Iran. *Id.* This practice, though acceptable, needed accurate oversight.  *Id.* Accordingly, after the plea agreement, Child Foundation's Board, to further improve its transparency, changed its practices to purchasing food from Child Foundation's U.S. office with commodities procured in North America. *Id.* This change improved management's visibility, control and accountability.  *Id.*

More specifically, Child Foundation currently places orders from its Portland office to a food vendor in Canada.  *Id.*  Their vendors often include Walker Seeds, Ltd. and Roy Legumex. The food vendor then sends the food directly to a port in Iran, where Refah Kudak picks up the food and takes it to a storage facility, where it is packaged.  From there on, the food is taken to distribution centers throughout Iran.  *See* Ex. C to the Seyedali Decl. (including photographs taken at distribution centers).  Prior to the plea agreement, children sponsored by Child Foundation were given coupons that they could exchange for any sort of food at a distribution center in Iran.  Seyedali Decl. at ¶ 10.  While this practice too was acceptable, the government expressed some concerns, and in an effort to ensure indisputable OFAC compliance, Child Foundation has made additional changes.  *Id.* Accordingly, Child Foundation now ensures that the food is being specifically distributed in Iran as intended.  *Id.*  The children and their families must now present a coupon for a certain type of food, and the distribution stores provide the families with that food in return.  The families must sign for the food and present identification that establishes that they are Child Foundation sponsored children. *Id.* Furthermore, in more remote areas, Refah Kudak has social workers who take the food directly to children at the beginning of every month. *Id.*

6.  <u>Child Foundation Oversight of Refah Kudak</u>.

For the past two years, Child Foundation's Board has mandated and performed yearly, detailed onsite inspections and audits of Refah Kudak with the latest being performed in September of 2011.  *Id.* at ¶ 11.  These audits have been invaluable for the Board, as they provide much needed visibility with respect to Refah Kudak's distribution of food in Iran. *Id.*

PAGE 18 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

Through these audits, the Board reviews all aspects of Refah Kudak's business operations and makes needed recommendations to ensure that the food distribution is in accordance with OFAC rules and regulations. *Id.* Child Foundation obtained independent financial audit reports of Refah Kudak. *Id.* Through these audits, the Board has ensured that Child Foundation's sponsors' donations are adequately distributed. *Id.* Child Foundation has gained substantial confidence in the infrastructure of Refah Kudak as a reputable NGO attending to humanitarian needs of children in Iran. *Id.* Furthermore, Refah Kudak implemented a sweeping management change in response to Child Foundation's request. All of the members of Refah Kudak's board of trustees and board of directors that were related to Dr. Yasrebi have resigned, and new members have been selected. *Id.* Refah Kudak is also operating under a new Managing Director; the previous Managing Director, Mr. Ahmad Iranshahi, resigned. *Id.* Child Foundation ascertained documentation of these resignations and documented them under the 2011 onsite inspection and audit of Refah Kudak in Iran. Documentation of the 2011 onsite inspection is attached as Exhibit C to the Seyedali Decl.

Furthermore, in 2011, CF started an extensive dialogue with the new management of Refah Kudak which resulted in a comprehensive new memorandum of understanding ("MOU") between Child Foundation and Refah Kudak. Seyedali Decl. at ¶ 12. The final draft MOU was prepared and approved by Child Foundation's OFAC attorneys and signed by both parties in September 2011, effective for fiscal year 2011-2012. *Id.* This MOU is also submitted herewith as Exhibit D to the Seyedali Decl. In the past, the business arrangement between the two entities was based on verbal agreements and communications via email between Refah Kudak's previous managing director (Mr. Iranshahi) and Child Foundation's previous president (Dr. Yasrebi). *Id.* These individuals are no longer involved with the organizations. *Id.* Any changes in Child Foundation and Refah Kudak's working relationship will be coordinated with Child Foundation's OFAC attorneys, recorded as an addendum to the MOU and approved by both parties. *Id.*

PAGE 19 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

Since Child Foundation was founded, it has helped over 12,000 children in need all over the world. Throughout its existence, it has focused on giving to those who are most in need by providing food, clothing, medicine, disaster relief, and access to education. The Foundation hopes to continue its important work in the future while staying in strict compliance with all United States laws and regulations.

### D. Child Foundation Has Suffered Greatly As A Result of the Felony Conviction.

Child Foundation's operations have been negatively affected by the lengthy investigation of the government and the felony conviction in countless ways. Seyedali Decl. at ¶ 13.

1. Decrease in Donations.

When negative news about Child Foundation was released by the government in mid-December 2010, Child Foundation experienced a 27% decrease in donations. *Id.* This was alarming, and it has taken Child Foundation months of dedicated effort to begin to gain back the public's trust. *Id.*

Furthermore, many groups and organizations from which Child Foundation used to receive tens of thousands of dollars in matching funds informed Child Foundation that they would drop them from their program. *Id.* The matching funds were instrumental in keeping Child Foundation's overhead low and making more of donors' donations go to the children served. *Id.*

2. Ratings Agencies.

Prior to the 2011 Plea Agreement, Child Foundation had been viewed and rated by the most prestigious United States accreditation agencies. *Id.* at ¶ 14. The Better Business Bureau ("BBB") gave Child Foundation their best rating in 2009, based on their assessment of Child Foundation's Charity Accountability Standards. *Id.* Child Foundation also received the Independent Charities Seal of Excellence from Independent Charities of America ("ICA") in 2009. *Id.* Upon rigorous independent review, ICA was able to certify, document, and demonstrate on an annual basis that Child Foundation met the highest standards of public

PAGE 20 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

accountability, program effectiveness, and cost effectiveness.  *Id.* Only 2,000 charities in the United States have been awarded this seal. Further, Charity Navigator, America's premiere independent charity evaluator, gave Child Foundation four out of four stars for its accountabilities and transparencies for two consecutive years.  *Id.*

Within two weeks of Child Foundation's plea agreement, the majority of rating agencies as well as financial institutions contacted Child Foundation and informed them of their decision to cancel their relationships with them.  *Id.* For example, BBB informed Child Foundation that they would delete Child Foundation's name and information from their website. *Id.*  ICA did the same.  Charity Navigator informed Child Foundation that they would delete all information about Child Foundation and replace it with the news released by the FBI. *Id.*

3.  Financial Institutions.

In mid-January of 2011, Bank of America, with whom Child Foundation had been doing business for over fifteen years, informed Child Foundation that they would close their account within a month.  Seyedali Decl. at ¶ 15.  They closed Child Foundation's credit card immediately.  Child Foundation opened other accounts at other banks, but within weeks, all of them informed Child Foundation that they too would be discontinuing services and closing Child Foundation's accounts.  *Id.*  Other financial services institutions, such as American Express and PayPal, which were instrumental in Child Foundation's work, informed them that they would no longer provide services to Child Foundation.  *Id.*

4.  Morale.

This case has had a devastating impact on Child Foundation's employees' morale. Seyedali Decl. at ¶ 16.  It not only caused them much emotional discomfort, but it forced a lot of overtime work and unnecessary new assignments in customer service and marketing.  *Id.*  This prevented Child Foundation from focusing on their important fundraising tasks.  *Id.* As a result of these problems, three of Child Foundation's employees quit in 2010.  *Id.*

PAGE 21 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

Furthermore, to counter the effects of the plea agreement with the government, Child Foundation has had to spend a considerable amount of funds over its yearly budget for legal expenses. *Id.* Higher legal bills translate into higher overhead and fewer available funds for children who desperately need Child Foundation's assistance. *Id.*

However, in spite of this negativity, Child Foundation is moving forward in its mission. As a part of Child Foundation's efforts to be transparent with its donors, Child Foundation provides opportunities for its sponsors to visit their sponsored children in Iran. In the past year, over three hundred sponsors have visited their sponsored children. Seyedali Decl. at ¶ 17. Plus, board members have increased the number of inspections and visits to Iran's office. *Id.* Since December of 2010, Child Foundation has had at least six visits to Refah Kudak by its board members and three visits by its executive manager to Iran's offices. *Id.*

### III. ARGUMENT

**A.    The Sentencing Guidelines Are Advisory Only.**

As the Court is well aware, the Sentencing Guidelines are advisory only, and the sentencing court's discretion should be guided by the factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220 (2005).

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a "sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." The factors that the Court should consider when sentencing Child Foundation include:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The need for the sentence imposed:

   a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   b. To afford adequate deterrence to criminal conduct;

   c. To protect the public from further crimes of the defendant;

PAGE 22 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

      d.  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. The kinds of sentences available;

4. The kinds of sentence and the sentencing range established by the guidelines;

5. Any pertinent policy statement;

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Accordingly, while the advisory guidelines are to be considered, they are one factor among the section 3553(a) factors that are to be taken into account in arriving at the appropriate sentence. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)(en banc). As discussed, these factors weigh in favor of a minimal fine and no term of probation.

**B.        The Conviction is Punishment Enough.**

Courts consistently recognize that a conviction alone can be punishment enough. In *United States v. Gaind*, for example, the Court found that the goals of sentencing outlined by section 3553 were substantially achieved prior to sentencing. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), aff'd 31 F.3d 73 (2d Cir. 1994). There, the court stated:

> In the present instance, the destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process. Elimination of the defendant's ability to engage in similar or related activities - or indeed any major business activity - for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence. Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.

*See also United States v. Speed Joyeros*, 204 F. Supp. 2d 412, 440 (E.D.N.Y. 2002). Scholars and commentators agree. *See, e.g.*, Christopher A. Wray & Robert K. Hur, The Power of the Corporate Charging Decision over Corporate Conduct, 116 YALE L.J. POCKET PART 306

PAGE 23 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

(2007), http://thepocketpart.org/2007/3/20/wray_hur.html (describing the "grim consequences of a corporate criminal charge alone—which often amount to a virtual death sentence for business entities"); Assaf Hamdani & Alon Klement, Corporate Crime and Deterrence, 61 Stanford Law Review 271, 277-78 (2008) (explaining criminal conviction is often "death penalty" for businesses); Pamela H. Bucy, *Trends in Corporate Criminal Prosecutions*, 44 AM. CRIM. L. REV. 1287, 1288 (2007) ("[T]here is no question that criminal prosecution of a corporation has a tremendous impact on the corporation and its community, employees, customers and lenders."). Indeed,

> The risk of indictment alone is devastating: a criminal indictment promises a swift market response, the ouster of leadership, millions of dollars in legal fees, and, of course, the possibility of a conviction. Such a conviction would lead not only to any criminal penalties imposed (usually a heavy fine), but also to what others have termed "collateral consequences" – devastating financial and reputational repercussions that can, and do, force companies out of business.

116 YALE L.J. POCKET PART 306 at p. 128 (2007) .

As explained above, Child Foundation has suffered tremendously due to its felony conviction. It has lost some of its donors, donations have significantly decreased, access to financial institutions has nearly been eliminated, ratings agencies have removed their ratings, and Child Foundations' internal morale has been hit hard. This is punishment enough. Any further punishment would only harm the children sponsored by the Foundation.

**C.    Alternatively, the History and Characteristics of the Foundation Support a Reasonable Fine and No Probation.**

While the defense does maintain that the felony conviction—and its attendant collateral consequences discussed above—is a severe punishment to this non-profit organization, the defense recognizes that the Court must impose either a fine or probation. 18 U.S.C. § 3551(c). As will be explained below, the defense believes that the factors present in § 3553(a) warrant no more than a reasonable fine and no period of probation.

Support for such a sentence can be found when the Court examines the very first factor listed under 18 U.S.C. § 3553(a). Specifically, 18 U.S.C. § 3553(a)(1) requires the Court to

PAGE 24 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

consider the history and characteristics of the Foundation. *See United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (stating that the sentencing court must not lose "sight of the offender" and that "the record [must] reflect the required consideration of the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1)").

Indeed, the Supreme Court has stressed the importance of this factor in guiding the sentencing determination. Last Term in *Pepper v. United States,* 131 S.Ct. 1229 (2011), the Supreme Court noted: "In particular, we have emphasized that [h]ighly relevant— if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." 131 S.Ct. at 1235 (citing *Williams v. New York*, 337 U.S. 241, 246-47, 69 S.Ct. 1079 (1949)). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* at 1240 (citing *Wasman v. United States*, 468 U.S. 559, 564, 104 S.Ct. 3217 (1984)).

Here, the history and characteristics of the Foundation support a reasonable fine and no term of probation. The Foundation has a long standing history of substantial humanitarian aid to poor children in Iran and throughout the world. Child Foundation's programs serve children in Afghanistan, Indonesia, Iran, the United States, and all around the world. The Foundation is extremely active in disaster relief efforts, and the charity does not have any governmental, political, or religious affiliations. Its sole focus is to provide aid to children. That aid has not only benefitted the children, but has had a broader effect of enhancing the standing and reputation of the United States with the people of many of these countries.

In addition, the Foundation—on its own initiative—has gone above and beyond the requirements of the Plea Agreement and has completely revamped its operations, compliance, and personnel—all individuals related to Mr. Yasrebi and Mr. Iranshahi are no longer working with the Foundation; it has a new and active Board of Directors who have stepped up to ensure the proper operation of the Foundation. The Foundation has also implemented a sophisticated

PAGE 25 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

system of checks and balances to assure the lawful and efficient operation of the Foundation as it moves into 2012 and beyond.

**D.    A Heavy Fine and/or a Term of Probation Would Be a Punitive Punishment Undermining the Goals of Sentencing.**

The dictates of Section 3553(a) warrant the sentence suggested by the defense. The statute specifically dictates that the sentencing court shall impose a "sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See also Pepper*, 131 S.Ct. at 1242 ("sentencing judge's **overarching duty** under § 3553(a) [is to] to impose **a sentence sufficient, but not greater than necessary**" to comply with the sentencing purposes set forth in § 3553(a)(2)") (emphasis added).

The defense submits that under this standard any fine greater than $10,000 would be punitive; such a fine would undermine the policy set forth in 3553(a) and would literally take away resources needed to help poor children.

Similarly, any period of probation is not necessary. The new leaders of the Foundation have "self-imposed" many changes and safeguards to the organization and such changes demonstrate that the Foundation can govern itself. Additional supervision by the Probation Office would just be an unnecessary use of scarce government resources. In addition, Probation is unnecessary given the continuing duties of cooperation imposed upon the Foundation under the Plea Agreement, discussed above. Moreover, any period of probation would be as punitive and counter-productive as a heavy fine. Probation would severely hamper fundraising efforts by the Foundation, impact morale of the employees, result in additional costs which would undercut resources for the poor, and would decimate the Foundation's attempts to maintain critical banking relations here in Portland to keep the flow of aid going to the poor. Those are severe collateral consequences that this "new" and revamped organization should not have to bear going forward.

PAGE 26 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

**E.      Even if the Court Were to Consider the Advisory Guidelines, the Provisions Relating to the Sentencing of Organizations And the Rational of Those Provisions Supports the Sentence Sought by the Defense.**

Chapter 8 of the advisory guidelines applies to the sentencing of organizations.  The introductory comment states that "the fine range for any [] organization should be based on the seriousness of the offense and the culpability of the organization." *See* Chapter 8, Federal Sentencing Guidelines Manual, Introductory Comment. "The two factors that mitigate the ultimate punishment of an organization are: (i) the existence of an effective compliance and ethics program; and (ii) self-reporting, cooperation, or acceptance of responsibility." *Id.*; *United States v. CR Bard, Inc.*, 848 F. Supp. 287, 292 (D. Mass. 1994) (crediting corporate defendant with "having accepted responsibility for its past behavior, while not attempting to diminish, excuse or justify it, and with taking steps designed to prevent it from recurring" including new corporate compliance program); *United States v. Siemens Aktiengesellschaft*, No. CR-08-367 (D.D.C. Dec. 12, 2008) (DOJ Sentencing Memorandum) (recommending that court impose a fine that was a mere fraction of the applicable range under the advisory guidelines based on the substantial assistance and cooperation).

Child Foundation has fully accepted responsibility past responsibility, based on the theory of *respondeat superior*.  However, Child Foundation of the past is markedly different from the charity before the Court now.  In considering Child Foundation's "culpability," the Court should consider the drastic changes the Foundation has made to ensure that it operates well within the bounds of United States rules and regulations. In addition, it has fully cooperated in the government's investigation and has continuing obligations to do so. *See Plea Agreement at ¶ 6.*

Furthermore, Child Foundation has fully implemented an effective compliance program. The Foundation worked tirelessly with its counsel to create a compliance program that would prevent Child Foundation from violating any United States rules and regulations.  As explained more fully in Section (II)(C)(3) *supra*, the compliance program expressly prohibits any

PAGE 27 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

"financial transaction facilitating CF's provision of humanitarian articles to sponsored children within Iran [involving] a prohibited Iranian financial institution," and it prohibits the Foundation from sending anything to Iran other than humanitarian articles.

Other sections of Chapter 8 of the advisory guidelines also  support the mitigated sentence sought by the defense.  For example, Chapter 8C addresses the determination of the fine to be imposed.  Section 8C4.8 of the advisory sentencing guidelines suggests that a downward departure in the fine amount is warranted in certain circumstances.  Section 8C4.8 states as follows:

> If the members or beneficiaries, other than shareholders, of the organization are direct victims of the offense, a downward departure may be warranted.  If the members or beneficiaries of an organization are direct victims of the offense, imposing a fine upon the organization may increase the burden upon the victims of the offense without achieving a deterrent effect.  In such cases, a fine may not be appropriate.

This section supports the reasonable and common sense proposition that a fine should be mitigated if it hurts the beneficiaries of the organization.  This policy behind section 8C4.8 applies here.  Any fine imposed will only harm the beneficiaries of the Foundation—the needy children throughout the world who rely on the Foundation's generosity for their basic life necessities.

**F.      Any Fine Imposed Should Be Reduced by Analogy to Section 8C3.3(a) and (b).**

The policies behind section 8C3.3 of the sentencing advisory guidelines are applicable and support a mitigated fine.  Pursuant to section 8C3.3(a), a reduction is warranted where the imposition of a fine would impair an organization's ability to make restitution to its victims.  By analogy here, the fine should be reduced because any fine imposed reduces the Foundation's ability to carry out its mission

Further, under section 8C3.3(b), the Court may reduce a fine below the advisory guideline range if the Court finds that the organization is not able to pay the minimum fine.  While this section is not directly on point in this case (as the Foundation can pay some fine), the

PAGE 28 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

policy behind this provision shows that the court has discretion to reduce a fine. Child Foundation cannot pay *any fine* without cutting into funds that are used to provide for needy children—including children in the greater Portland area.

## G.    None of the Factors Under Section 8D1.1 Warrant the Imposition of Probation.

The advisory guidelines list factors that mandate the imposition of a period of probation on an organization. However, none of those factors are present in the instant case. In particular, section 8D1.1 of the advisory guidelines states as follows:

(a)    The court shall order a term of probation:

(1)    if such sentence is necessary to secure payment of restitution (§8B1.1), enforce a remedial order (§8B1.2), or ensure completion of community service (§8B1.3);

(2)    if the organization is sentenced to pay a monetary penalty (e.g., restitution, fine, or special assessment), the penalty is not paid in full at the time of sentencing, and restrictions are necessary to safeguard the organization's ability to make payments;

(3)    if, at the time of sentencing, (A) the organization (i) has 50 or more employees, or (ii) was otherwise required under law to have an effective compliance and ethics program; and (B) the organization does not have such a program;

(4)    if the organization within five years prior to sentencing engaged in similar misconduct, as determined by a prior criminal adjudication, and any part of the misconduct underlying the instant offense occurred after that adjudication;

(5)    if an individual within high-level personnel of the organization or the unit of the organization within which the instant offense was committed participated in the misconduct underlying the instant offense and that individual within five years prior to sentencing engaged in similar misconduct, as determined by a prior criminal adjudication, and any part of the misconduct underlying the instant offense occurred after that adjudication;

(6)    if such sentence is necessary to ensure that changes are made within the organization to reduce the likelihood of future criminal conduct;

(7)    if the sentence imposed upon the organization does not include a fine; or

(8)    if necessary to accomplish one or more of the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Here, none of the factors set forth in section 8D1.1(a)(1)-(8) are present. First, there is no restitution payment, remedial order, or community service at issue in this action. Second, the

PAGE 29 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

organization has not yet been ordered to pay a fine.  If it is so ordered, any penalty will be promptly paid without any need for oversight.  Third, Child Foundation has fewer than 50 employees *and* has a fully implemented effective compliance plan.  Fourth, there has been no other misconduct similar to the misconduct at issue in this action.  Even more, the Foundation of today has been completely revamped and improved to avoid any future misconduct.  Fifth, there is no such high-level official as described in section 8D1.1(a)(5).  Dr. Yasrebi, Child Foundation's former president who was investigated and prosecuted in this action, is no longer working with the Foundation in any capacity.  Sixth, no term of probation is needed to ensure that changes are made to reduce the possibility of future criminal conduct.  All needed changes have already been implemented, without the Court ordering the Foundation to do so.  Child Foundation's compliance program has been provided to the probation office.  Seventh, while the imposition of a fine will clearly take away money that could be used to support the Foundation's beneficiaries, Child Foundation is prepared to pay a small fine rather than continue to live with the stigma of a term of probation.  And finally, as discussed above in section (III)(A) *supra*, the factors set forth in 18 U.S.C. § 3553(a)(2) militate toward a sentence of no probation.

**H.    The Self-Imposed Changes by the Foundation and the Continuing Duties Under the Plea Agreement Satisfy the Conditions of Probation that Would Have Been Imposed Under Section 8D1.3 and 8D1.4.**

Further support for the defense's contention that probation is not warranted in this case can be found in Sections 8D1.3 and 8D1.4 of the advisory sentencing guidelines. Those sections delineate the mandatory and suggested terms of probation if a court were to impose probation on an organization.   However, because Child Foundation has already implemented a fully effective compliance program, and because Child Foundation has continuing duties under the plea agreement, the conditions of probation set forth in sections 8D1.3 and 8D1.4 are not necessary.

Section 8D1.3 requires the probation to: (a) include a condition that the organization not commit another crime during the probation; (b) include a condition of restitution or community service, unless a fine is imposed; and (c) include any other conditions that are reasonably related

PAGE 30 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

to the offense.  However, probation is not needed to address any of these factors.  Child Foundation has positioned itself to avoid any further legal infractions (and the continuing scrutiny by the Executive Branch will assure that this happens).  Plus, the burdens of the investigation and conviction in this case have taught it a lesson that will not soon be forgotten and give the organization ample motive to adhere to all rules and regulations.  Further, there is no need for restitution or community service. *All* of Child Foundation's activities already focus on community service (not to mention that the Foundation anticipates that the Court will impose a minimal fine).

Section 8D1.4 delineates conditions of probation that could be imposed to ensure an organization's ongoing compliance.  As discussed herein, there is simply no need for such oversight.  Not only has Child Foundation implemented a detailed and valuable compliance program, but all of the individuals that were involved with the wrongdoing at issue in this action are no longer working with the organization in any way.  There has been no evidence whatsoever that any wrongdoing is continuing, or even that there is any risk of wrongdoing.  In turn, no term of probation is warranted.[12]

---

[12] Section 3553(a)(6) states that a district court shall also consider, when imposing a sentence, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  While there are few cases involving similar conduct, *United States v. Mubayyid* is instructive.  658 F.3d 35 (1st Cir. 2011).  In *Mubayyid*, the defendant's charges stemmed from his involvement with Care International, Inc. ("Care"). *Id.* at 40.  The Court found that Care was supporting and promoting Islamic jihad and fighters known as "mujahideen." *Id.*  The "government's central theory at trial was that Muntasser had established Care in order to fraudulently obtain a tax exemption, so that contributions being used to finance mujahideen overseas could be deducted from individual tax returns as charitable donations." *Id.*  Care, however, was never charged with any crime or issued any sentence whatsoever.  Child Foundation should be treated similarly.  Furthermore, (as discussed more fully in Yasrebi's sentencing memorandum) in September of 2000, Child Foundation retained an attorney, Mr. Shawn Khastoo, to file an application with OFAC that would permit Child Foundation to carry out its mission by wire transferring funds directly to Iran.  Previously, Mr. Khastoo had written to OFAC on behalf of the Kahrizak Foundation.  The Kahrizak Foundation is a self-described "charitable organization dedicated to raising funds in order to support MS patients, elderly and disabled individuals in the care of Kahrizak Foundation of Iran."  Accordingly, Kahrizak Foundation is engaged in activity similar to Child Foundation's—both work to alleviate suffering in Iran.  OFAC *granted* Kahrizak's OFAC application, expressly permitting them to engage in the very behavior for which Child Foundation is now being

PAGE 31 - DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

## IV.  CONCLUSION

The stigma of the felony has been a substantial punishment to the Foundation and has already caused substantial financial and reputational harm to the Foundation.  Given the self-imposed oversight this new Board has imposed on the organization, a realistic fine and the continuing obligations of cooperation with the government are all the additional punishment necessary to assure a sentence "sufficient but not greater than necessary" to comply with the mandate of 18 U.S.C. § 3553(a).  Such a sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense; afford adequate deterrence to criminal conduct; and, most assuredly,  eliminate any concern for the need to protect the public from further crimes of the defendant.

DATED:  January 25, 2012

LANE POWELL PC

By _s/ Erin M. Wilson_
  Robert R. Calo, OSB No. 071037
  Telephone:  503.778.2104
  calor@lanepowell.com
  Erin M. Wilson, WSBA No. 42454
  Telephone: 206.223.7432
  wilsonem@lanepowell.com
  Attorneys for Defendant Child Foundation

---

sentenced.  Accordingly, in order to avoid unwarranted sentencing disparities, the Court should impose the sentence advocated by the defense.

PAGE 32 -  DEFENDANT CHILD FOUNDATION'S SENTENCING MEMORANDUM

709592.0001/5253837.3